THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WALLACE MONTGOMERY | ) | |
| | ) | |
| Plaintiff, | ) | |
| V. | ) | Case No. 2:06-cv-880-WKW |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

THE UNITED STATES' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Comes now the Defendant, United States of America, to submit the following proposed

findings of fact and conclusions of law, pursuant to this Court's order following the bench trial of

the above-captioned case.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    CIRCUMSTANCES OF THE ACCIDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The parties and the weather conditions at the time of the accident . . . . . . . . . . . 1

    B.    Very little weight is given to the Accident Report's account of the accident and the speed of Mrs. Moore's vehicle at the time of the accident . . . . . . . . . . . . . . 3

    C.    Mrs. Moore's tire failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.    Effect of the deflation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.    No prejudice from the failure to have Mrs. Moore's vehicle analyzed . . . . . . . . 12

II.   INJURIES TO MR. MONTGOMERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    A.    Off-setting Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    Medical Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    Lost Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Other Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    E.    Non-economic damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PROPOSED CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTRODUCTION

Plaintiff Wallace Montgomery[1] ("Mr. Montgomery") claims that United States employee, Mrs. Bertha Gordon Moore, negligently operated her vehicle on August 29, 2003, and because of that negligent operation, actually and proximately caused her vehicle to cross the median of Interstate 65 and strike their vehicle. However, following a bench trial held February 25-27, 2008, the Plaintiff failed to meet his burden of proving either that Mrs. Moore was negligent in operating her vehicle or that any alleged negligence was the actual and proximate cause of the accident and the resulting injuries. Because of this failure of proof, he cannot succeed on his claim. The Court concludes that this unfortunate accident was unavoidable, and accordingly, judgment must be entered in favor of the Defendant, United States of America.

## PROPOSED FINDINGS OF FACT

### I.    CIRCUMSTANCES OF THE ACCIDENT

#### A.    The parties and the weather conditions at the time of the accident.

1. On August 29, 2003, Mrs. Bertha Gordon Moore, then and now a paralegal administrative assistant to the United States Attorney for the Middle District of Alabama, was driving home from a law enforcement conference, heading northbound on Interstate 65. Testimony of Bertha Gordon Moore ("Mrs. Moore"). She was acting within the scope and course of her employment at all times relevant to the subject matter of these proceedings.

---

[1] Plaintiff's wife, Phyllis Montgomery ("Mrs. Montgomery"), was named as an additional plaintiff in this action, but was settled out of the case. Pursuant to stipulation, her case is dismissed.

2.  Mrs. Moore was driving a Mercury Mountaineer that had been purchased used in May of 2003. There had been no maintenance issues with her tires or other equipment on the vehicle prior to August 29, 2003. Testimony of Mrs. Moore.

3.  On August 29, 2003, Plaintiff Wallace Montgomery, accompanied by his wife Phyllis Montgomery, left his home in Norcross, and were driving southbound on Interstate 65 Mississippi, where they own a boat. Testimony of Mr. Montgomery; Testimony of Mrs. Montgomery. Mrs. Montgomery had assumed driving responsibilities, and Mr. Montgomery was in the front passenger seat of their Volvo station wagon. Id.

4.  Somewhere near Evergreen, Alabama, Conecuh and Butler County lines, and mile marker 106 on Interstate 65, at or near 2:30 p.m., Mrs. Moore was making a lane change, heard a loud noise, felt the back of her vehicle drop, and, while she attempted to brake, lost control of her Mercury Mountaineer, which crossed the median and collided with the Allens' Lincoln Towncar. Exhibit 6, Alabama Uniform Traffic Accident Report ("Accident Report"); Testimony of Mrs. Moore, Mr. Allen, Mrs. Allen, Ms. Allen, Wallace Montgomery ("Mr. Montgomery") and Phyllis Montgomery ("Mrs. Montgomery"). Mrs. Moore's vehicle, after impacting the Allens' vehicle, then struck the Montgomerys' Volvo. Id.

5.  The parties have offered inconsistent testimony about the weather conditions at the time of the accident. Mrs. Moore has stated that it was raining and the road was wet at the time of the accident. Testimony of Mrs. Moore. This account was substantiated by both the Accident Report and the testimony of then-Alabama State Trooper Robert Fisher, who responded to the scene of the accident and authored the Accident Report. Trooper Fisher testified that it was raining when he left his post at Evergreen, south of the accident, and it was raining up to and

including his arrival on the scene. Testimony of Trooper Robert Fisher ("Trooper Fisher").

Trooper Fisher also stated that the median was wet and muddy and that tire tracks in the direction

of the northbound to southbound lanes were readily apparent. Id. The Allens and the

Montgomerys testified, however, that it was dry and sunny at the time of the accident, and rain

only came on the scene afterwards, while they were being treated for injuries and transported to

Evergreen Medical Center. Testimony of Mr. Allen, Mrs. Allen, and Ms. Allen; Testimony of

Mr. Montgomery and Mrs. Montgomery.

6. For purposes of this case, the issue of whether or not it was raining at the time of the

accident is not crucial, particularly regarding causation. The accident occurred more than four

years ago, and for purposes of the case, the Court will assume that all accounts have some truth

to them. Mrs. Moore likely drove through some rain prior to the accident, as did Trooper Fisher,

whose arrival at the scene was some 20 minutes after the accident had been reported. Testimony

of Mrs. Moore; Testimony of Trooper Fisher. There was testimony that the rain was moving

from the south to the north, and that is at least consistent with the Allens' and Montgomerys'

recollection that the rain arrived after the accident. Testimony of Mrs. Montgomery. The Court

credits all accounts of the conditions, and for reasons discussed more fully below, need not go

further in deciding what the road conditions were like at the time of the accident.

**B.      Very little weight is given to the Accident Report's account of the accident
and the speed of Mrs. Moore's vehicle at the time of the accident**

7. Prior to the commencement of trial, the Court overruled the Defendant's motion to

exclude the portion of the Accident Report estimating Mrs. Moore's vehicle speed at the time of

the accident as 83 miles per hour. The Court did so on the basis of testimony from the author of

the report, Trooper Robert Fisher. He testified that an unidentified female with shaking hands, voluntarily approached him right after he had arrived on the scene and told him that she had been traveling 83 miles per hour. The witness further stated that Mrs. Moore's vehicle, which was in front of hers, had been traveling the same speed. Testimony of Trooper Fisher. Notably, the witness left the scene of the accident in spite of his directions to stay so that her contact information could be recorded. The Court must determine what weight to afford this evidence.

8. Though this evidence was admitted, subsequent testimony and evidence have shown that the reliability of this estimate of speed is minimal, and the Court affords it little weight for the following reasons. See Fed.R.Evid. 104(a), (e) (rules governing admissibility and weight).

9. Trooper Fisher's report contains several errors, which he admitted during his testimony. These errors may not have been material to the cause of the accident, but do indicate that some contents of the accident report are not accurate.

10. Trooper Fisher's testimony included, at the Court's questioning, an identification of the location where the accident occurred. Trooper Fisher identified, through photographs admitted as evidence of the scene of the accident, an area of the median where, according to him, tire tracks from Mrs. Moore's vehicle indicating the path her vehicle took at the time of the accident were located. Testimony of Trooper Fisher; Exhibits 12A-12V, photos of Interstate 65.

11. Mrs. Montgomery, however, testified that the scene of the accident was not where Trooper Fisher remembered it. She, upon viewing the same photographs, identified the scene of the accident differently, so much so in fact, that none of the photographs clearly illustrate what the median looks like near the scene of the accident. Testimony of Mrs. Montgomery; Exhibits 12A-12V, photos of Interstate 65. For example, Mrs. Montgomery testified that the median was

steep, and she chose not to turn onto it to avoid collision with Mrs. Moore's vehicle out of fear that her vehicle would roll over. Testimony of Mrs. Montgomery. The photos in exhibits 12A-12V show a relatively flat median, and do not reflect the steepness that Mrs. Montgomery remembers. Exhibits 12A-12V, photos of Interstate 65.

12. Trooper Fisher testified that the 83 miles per hour estimate was corroborated by the wreckage caused to the vehicles at the scene and his investigation of the accident, which included a rough diagram contained in his accident report of the final resting point of each vehicle, the estimated points of impact based on gouge marks in the road, and the likely paths of each vehicle involved in the accident. Testimony of Trooper Fisher; Exhibit 6, Accident Report.

13. Notably, the accident report contained no measurements other than the width of the southbound roadway. Trooper Fisher's investigation did not include other measurements, in part because the procedure for filling out accident reports did not require them. He did not base his estimate of speed on crush factors, skidmarks, vector measurements, or any other scientific method that could have incorporated both the mass of the vehicles involved, their final resting points, the points of impact, and their directional headings at the time of the accident. Testimony of Trooper Fisher; Exhibit 6, Accident Report.

14. Trooper Fisher further admitted that he did not take any classes, nor was he an expert in accident reconstruction. Testimony of Trooper Fisher. The two experts in accident reconstruction in this case, Mr. Clifford Prosser and Mr. Ralph Cunningham, both testified that Trooper Fisher's report contained no information from which a calculation of the speed of any of the vehicles could be made. Testimony of Clifford Prosser ("Mr. Prosser"); Testimony of Ralph Cunningham ("Mr. Cunningham").

15. Trooper Fisher's conclusions as to why Mrs. Moore's vehicle crossed the median were also wrong. The plaintiff's expert, Mr. Prosser, testified that, years after the accident, Trooper Fisher told him that he believed Mrs. Moore fell asleep behind the wheel of her car. Testimony of Mr. Prosser. This conclusion was not reflected in the accident report, nor was it accurate. Exhibit 6, Accident Report. Trooper Fisher never interviewed or spoke with Mrs. Moore following the accident. Testimony of Trooper Fisher. The Court finds that his investigation and, significantly, theory as to causation would have been different if he had, at a minimum, had the opportunity to speak with her.

16. It is also telling that Trooper Fisher never discovered, nor mentions in his testimony or report, that Mrs. Moore's vehicle suffered a tire deflation immediately preceding the accident. Testimony of Trooper Fisher; Exhibit 6, Traffic Accident Report.

17. In short, Trooper Fisher's estimate of speed was based on the statement of a singular witness, one whom he described as shaking, trembling, shaken up at the time, and his belief that this estimate was correct in light of the damage caused to the vehicles. Testimony of Trooper Fisher. The reliability of the witness's statement and the thoroughness and accuracy of Trooper Fisher's investigation has very clearly been called into question, and this Court affords the speed estimate of 83 miles per hour, based thereon, very little weight.

18. Mrs. Moore's testimony that she was traveling only 60 to 65 miles per hour when the accident occurred is credited as being more likely. She testified that she looked at her speedometer very near the time of the accident, before changing lanes, and her testimony in this regard is more plausible than an unidentified, unverified, unknown witness's statement that was

-6-

later incorporated into an accident report.  Testimony of Mrs. Moore; Exhibit 6, Traffic Accident Report.

19.  In any event, the Court finds that Mrs. Moore's speed at the time of the accident did not contribute in any material way to the cause of the accident, as discussed below.

**C.    Mrs. Moore's tire failure.**

20.  Central to this case was testimony and evidence that Mrs. Moore's left rear tire suffered a puncture, caused by an object that likely was a screw of some sort, and when this puncturing object was ejected from the tire, the air in the tire was expelled through the remaining hole, causing a deflation.  Testimony of Peter Flanner ("Mr. Flanner"); Testimony of Mr. Prosser; Testimony of Mr. Cunningham.

21.  It is clear from the testimony of both Mr. Flanner, the plaintiff's tire expert, and Mr. Cunningham, the Defendant's tire expert, that there is no dispute concerning the events that led to the deflated tire.  The majority of the damage to the tire was caused during the accident, with the puncture being the only evidence of damage to the tire preceding the accident.  Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 28b, Report of Mr. Flanner; Exhibit 30d, Report of Mr. Cunningham.

22.  Both tire experts agree, and the Court finds, that an object punctured the tire at some point prior to the accident.  The exact amount of time the object was carried is unknown, but likely was no more than 300 or so miles, based on testimony and studies performed on tire

punctures.[2] Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 30d, Report of

Mr. Cunningham.

23. The location of this puncture was on the serial side of the tire, and the mounting of

the tire was such that the serial side faced inward, towards the wheel well. The size of the hole

left by the puncturing object was somewhere between 1/8 of an inch and 3/16 of an inch.

Testimony of Mr. Flanner; Testimony of Mr. Cunningham; Exhibit 28b, Report of Mr. Flanner,

Exhibit 30d, Report of Mr. Cunningham.

24. Both experts agree that there was no evidence that the tire had been operated in an

under-inflated condition prior to the accident. Testimony of Mr. Flanner; Testimony of Mr.

Cunningham; Exhibit 30d, Report of Mr. Cunningham.

25. Mrs. Moore did not know, and had no reason to know, that her tire had been

punctured before the accident. The location of the puncture and the absence of any evidence that

the tire had been operated in an under-inflated condition indicate that a reasonable person would

not have known about any problem relating to the puncture or the inflation of the tire prior to the

accident. Testimony of Mrs. Moore; Testimony of Mr. Flanner; Testimony of Mr. Cunningham.

---

[2] Indeed, the Court takes judicial notice that, according to maps, Montgomery, Alabama, and Perdido Beach are more than 150 miles apart, and the object was likely picked up during Mrs. Moore's travels. Fed.R.Evid. 201. It rejects any notion, suggested by the plaintiff, that the object had been carried for some "lengthy" period of time. Plaintiff's Proposed Findings of Fact and Conclusion of Law at 4. It further notes that, although some air may have escaped the air while that object was in the tire, the experts agreed that there was no evidence that the tire had been operated in an under-inflated condition. Had enough air in the tire deflated over this so-called "lengthy" period of time, some indication that the tire had been under-inflated during that period should have existed. It did not. The plaintiff's suggestion that Mrs. Moore is somehow to be blamed for not checking her tires to see whether one was deflated before heading home is belied by the record.

26.  There was no evidence that Mrs. Moore should have replaced her tires before the accident.  The experts both testified that Mrs. Moore had 2/32 of an inch of remaining usable tread, and the "wear bars" that indicate it is time to replace a tire were neither visible nor imminently visible prior to the accident.  Testimony of Mr. Flanner; Testimony of Mr. Cunningham.

27.  There was some dispute in this case regarding how quickly Mrs. Moore's tire would have reached a fully or near-fully deflated state.  Mr. Flanner, the plaintiffs' expert, conceded that the deflation of the air would have been a "violent" event, but did not characterize the failure as a "blow-out."  Testimony of Mr. Flanner.  Similarly, Mr. Cunningham called the event a deflation, not a blow-out, and the Court finds that the tire did not "blow-out," but rather deflated "violently."  Testimony of Mr. Cunningham; Testimony of Mr. Flanner.

28.  As to how quickly the tire deflated, Mr. Cunningham opined, and demonstrated by way of a study performed on tire deflations, that a 1/8 inch puncture hole in a tire will result in full deflation in approximately five seconds.  The Court credits Mr. Cunningham's testimony, and finds that Mrs. Moore's tire reached full or near-full deflation in approximately five seconds.  Testimony of Mr. Cunningham; Exhibit 30d, Report of Mr. Cunningham.

29.  The Court further finds, however, based on testimony and research presented at trial, that Mrs. Moore more likely than not was unaware that her tire was in the process of deflating or had deflated until she changed lanes or heard a bang and felt the back of her car drop.  This is because research has shown that modern vehicle designs and construction of tires are such that a driver can drive on a deflated tire without noticing a problem until some driver input alters the

-9-

load placed on that deflated tire, making the deflation apparent. Testimony of Mr. Cunningham; Exhibit 30d, Report of Mr. Cunningham.

30. The Court finds that the deflation most likely occurred in five seconds or less, as Mr. Cunningham's report and testimony bear out. Moreover, the Court finds that Mrs. Moore's awareness of the deflation was sudden and without warning, and occurred while she was changing lanes at highway speed. Testimony of Mrs. Moore; Testimony of Mr. Flanner; Testimony of Mr. Cunningham.

**D.    Effect of the deflation**

31. The evidence presented at trial demonstrated that, in general, a deflated tire does not ordinarily cause a driver to lose control of a vehicle. Testimony of Mr. Prosser; Testimony of Mr. Cunningham; Exhibit 29c, Report of Mr. Prosser; Exhibit 30d, Report of Mr. Cunningham.

32. The research presented on tire blow-outs and tire deflations also demonstrate, as does common sense, that most tire deflation events do not result in loss of vehicular control or accidents. Testimony of Mr. Prosser; Testimony of Mr. Cunningham; Exhibit 29c, Report of Mr. Prosser; Exhibit 30d, Report of Mr. Cunningham. Mrs. Moore herself testified that she had suffered a "blow-out" or failure many years ago and did not lose control of her vehicle. Testimony of Mrs. Moore.

33. The Court finds, however, that although tire blow-outs and deflations do not ordinarily cause loss of vehicular control, sometimes they do. The testimony of Mr. Prosser and Mr. Cunningham on this point differs somewhat, but both are in agreement that a tire deflation followed by a driver response or driver input can cause loss of control. Testimony of Mr. Cunningham; Testimony of Mr. Prosser; Exhibit 30d, Report of Mr. Cunningham; Exhibit 29c,

Report of Mr. Cunningham. Mr. Cunningham opines that, even without driver input, in a small

and statistically insignificant number of cases a tire deflation alone can cause a loss of control

event. Testimony of Mr. Cunningham.

34. The Court finds, based on Mrs. Moore's testimony, that she did step on her brake

when she became aware of the deflated tire. Testimony of Mrs. Moore.

35. The Plaintiff's expert, Mr. Prosser, testified that at speeds in excess of 50 miles per

hour, vehicles traveling in a straight line will not suffer loss of control from a tire deflation or

blow out, but rather will continue to travel straight. He, therefore, concluded that Mrs. Moore,

by stepping on her brake when the deflation occurred, contributed to the loss of control of her

vehicle. Testimony of Mr. Prosser. Mr. Prosser further testified that manuals, such as one

published by tire manufacturer, Michelin, state that braking is not the proper response to a tire

blow-out or deflation event. Id.; Exhibit 29c, Report of Mr. Prosser. The Court takes as true that

manuals, such as the Michelin Manual, indicate that braking is not the best response to a tire

blow-out or deflation. There was no evidence, however, that Mrs. Moore owned such a manual

or, for that matter, had ever been told or educated that braking is not the safest response to a tire

blow-out or deflation. Testimony of Mr. Prosser; Testimony of Mrs. Moore.

36. The Court finds that Mrs. Moore, while traveling at highway speeds of around 65

miles per hour, was in the process of changing from the right to the left lane of travel when she

suddenly heard a loud noise, described as a pop or bang, and suddenly felt the back of her vehicle

drop in the direction of the driver's side. Testimony of Mrs. Moore. That moment was the first

she knew that her left rear tire had failed. Mrs. Moore instinctively stepped on the brake to slow

her vehicle. Her vehicle, however, continued in the direction of her lane change following the

deflation, and she was unable to regain control of her vehicle in spite of her attempts to brake. Testimony of Mrs. Moore. The plaintiff's attempt to discredit Mrs. Moore's testimony because they believed her deposition testimony on changing lanes differed from her account at trial is not accurate. Mrs. Moore explained what she meant in her deposition testimony, and drew a diagram consistent with her account to clarify the point. The Court does not find that her account differed in any substantial way and credits her testimony concerning the accident. Testimony of Mrs. Moore.

37. Therefore, the Court finds that the combination of the lane change, sudden and unexpected tire failure felt for the first time during that lane change, and attempt to brake caused Mrs. Moore to lose control of her vehicle, which then struck the vehicles driven by the Allens and the Montgomerys. The deflation would have occurred in wet or dry conditions, and Mrs. Moore's speed did not contribute to the loss of control of her vehicle. Testimony of Mrs. Moore; Testimony of Mr. Prosser; Testimony of Mr. Cunningham. The tire failure, in this case a sudden deflation caused by the ejection of a puncturing object, was an unforeseeable event and was not caused by any act or omission by Mrs. Moore relating to maintenance or operation of her vehicle. The question left for the Court is whether Mrs. Moore's act of stepping on her brake in response to the sudden tire failure was an unreasonable or negligent act. For the reasons stated in the Court's conclusions of law, the Court concludes that it was not.

E.    **No prejudice from the failure to have Mrs. Moore's entire vehicle analyzed**

38. The Court finds that Mrs. Moore's vehicle was destroyed or sent to salvage at some point between August 29, 2003, and the date of this trial. Mrs. Moore's husband took into his possession the left rear tire that failed and deflated, and that tire managed to remain in existence

for the years post-dating the accident. Testimony of Mrs. Moore. The plaintiff was told by Mrs.
Moore herself that her tire had blown out. Id. Neither they, nor their attorneys, ever conducted
an investigation into the cause of the accident as a result of the tire failure until the United States
discovered the existence of the tire and brought it to their attention.

39. The Court further finds that the destruction of Mrs. Moore's vehicle and the inability
to analyze any parts or equipment of her vehicle is not the fault of the Defendant. The
government, like the Plaintiff, was unable to analyze Mrs. Moore's vehicle, and by the time this
case reached full litigation status in federal district court, several years had elapsed. The United
States was not, nor was it ever, the owner of the vehicle, nor was it a party to the case until
several years later. In spite of the passage of time, the United States was able to obtain the left
rear tire and disclosed its existence to the Plaintiff. Analysis of that tire revealed what caused the
tire to fail, and both the United States and the Plaintiff were able to present evidence regarding
what occurred and a theory as to what caused this accident. There is no evidence that the
Plaintiff was prejudiced and, in any event, if he was prejudiced, it was through his own failure to
conduct a thorough investigation of the accident's cause.

## II.    Injuries to Mr. Montgomery

40. The Court finds that Mr. Montgomery suffered a complex tibial plateau fracture to
his right leg in the accident that required surgery to set and heal that fracture. Testimony of Mr.
Montgomery; Testimony of Mrs. Montgomery; Testimony of Dr. Weaver; Exhibit 48, Dr.
Weaver's report on Mr. Montgomery's examination; Exhibit 31e, Medical records and billing
from Peachtree Orthopaedic Clinic; Exhibit 68, Deposition Testimony of Dr. Thomas Moore
("Dr. Moore"). The nature of this fracture was such that it extended into Mr. Montgomery's

right knee, likely damaging some cartilage.  Testimony of Dr. Weaver; Exhibit 48, Dr. Weaver's

report on Mr. Montgomery's examination; Exhibit 68, Deposition Testimony of Dr. Moore;

Exhibit 69, Deposition testimony of Dr. David Covall ("Dr. Covall").  As a result of this

damaged cartilage, Mr. Montgomery's previously minor osteoarthritis was exacerbated, and

about a year and a half following the accident, Mr. Montgomery's right knee joint was entirely

replaced.  Id.; Exhibit 31f, Medical records and billing from Dr. Covall's office, Cumming

Resurgens Orthopaedics.  Some four years following the accident, another surgery was

performed to remove a plate that had been in place since the original surgery to heal his tibia

fracture.  Id.  The Court notes that Mr. Montgomery reported that the pain in his knee was

"completely gone" as of October 10, 2007.  Exhibit 31f, office notes from visit to Dr. Covall on

October 10, 2007.  That said, Mr. Montgomery was found to have a 20% whole person

impairment as a result of his injuries, and continues to have limitations.  Testimony of Dr. Keith

Weaver; Exhibit 48, Dr. Weaver's report on Mr. Montgomery's examination.  Mr. Montgomery,

in spite of his limitations on mobility, in particular, has not sought to mitigate the limitations

such as using a mechanized assistive device.  Testimony of Mr. Montgomery; Testimony of Mrs.

Montgomery.

    41.  The Court further finds that, while Mr. Montgomery likely suffered anxiety and stress

related to his injuries in the accidents, he did not suffer, nor does he claim to have suffered, from

any post-traumatic stress disorder.  Mr. Montgomery was never referred, nor did he seek any type

of therapy or counseling.  Testimony of Mr. Montgomery.

    42.  Additionally, Dr. Weaver's impairment ratings are not indicative of disability.  Dr.

Weaver's explained the difference between an "impairment" and a "disability" as follows: a car

with a broken window is impaired, but you can still drive it because it is not disabled. Mr. Montgomery no doubt suffered serious injuries in the accident, and he required a knee replacement due to those injuries. Mr. Montgomery's mobility has been hindered by his injuries, but the Court also notes that Mr. Montgomery has not attempted to mitigate these limitations through use of a mechanized assistive device, such as a scooter, or through continuous physical therapy. Testimony of Mr. Montgomery; Testimony of Phyllis Montgomery. His own treating physician has stated that Mr. Montgomery's main issue is weakness in his leg, and encouraged Mr. Montgomery to go back on a strengthening program. Exhibit 31f, Medical Records from Dr. David Covall, dated October 10, 2007. It does not appear, from Mr. Montgomery's testimony or any record evidence, that he has done so. Testimony of Mr. Montgomery; Testimony of Mrs. Montgomery; Testimony of Dr. Weaver; Exhibit 31f, Medical Records from Dr. David Covall, dated October 10, 2007.

## III.    Damages

43. The United States does not believe that the plaintiff is entitled to any damages in this case. Pursuant to the Court's order, however, should liability and causation be decided in the plaintiff's favor, the United States submits that the plaintiff is entitled to the following "special damages," as derived from testimony and exhibits admitted during trial.

44. Furthermore, the Plaintiff has stated that the United States stipulated to medical expenses, lost wages, and out-of-pocket expenses. Plaintiff's Findings of Fact and Conclusions of Law at 7-9. The United States is unaware of any such stipulations. While the United States stipulated to the Allens' billing records of Dr. Campbell, it did not stipulate to all of the expenses claimed by anyone else in this case. The plaintiff continues to have the same burden of proving

-15-

their damages by record evidence, and the United States did not, based on anything in the record, stipulate to Mr. Montgomery's damages.

### A.    Off-setting Amounts

45.  The Defendant has argued that it is entitled to off-setting amounts for payments made by insurance, and that the Plaintiff is entitled to be made whole, not put in a better position than he was before the accident.  The Court agrees, for the reasons stated in its conclusions of law, and has awarded Mr. Montgomery only those charges for which he owes a subrogation interest or, based on the evidence, was personally required to pay.

### B.    Medical Bills

46.  Mr. Montgomery claims medical expenses totaling $111,074.11.  Plaintiff's Proposed Findings of Fact and Conclusions of Law at 7-8.  The source of this figure appears to be a combination of his medical records and billing, and a letter indicating that Blue Cross/Blue Shield, his health insurer, claims a subrogation interest of $35,981.08.  Exhibit 31a-j, Mr. Montgomery's medical records and billing; Exhibit 33, Blue Cross/Blue Shield of Georgia subrogation letter.  Mr. Montgomery's testimony, and the Blue Cross/Blue Shield of Georgia letter, bear out that Mr. Montgomery's several surgeries and physical therapy were paid for by his insurance.  At trial, Mr. Montgomery testified about other bills, but there is no evidence in the record from which the Court can determine the amounts of these unspecified bills with the possible exception of bills relating to treatment he received immediately following the wreck at Evergreen Medical Center, which were $1,312.  Exhibit 31b-c; Exhibit 33 (showing no record of payment for bills submitted by Evergreen Medical Center or Conecuh County Emergency Medical Services); Testimony of Mr. Montgomery.  In Mr. Montgomery's case, the absence of

any evidence that he has paid anything for his medical care leads the Court to conclude that his

medical damages are $37,293.08, the amount his insurer has subrogation rights against him for

($35,981.08), plus the amount charged by Evergreen Medical Center and Conecuh County

Emergency Medical Services ($1,312) for treatment immediately following the accident, which

insurance apparently did not cover.  A higher award would, contrary to law of remedies as

discussed in the conclusions of law, place Mr. Montgomery in a better position than he was

before the accident.  The plaintiff's reference to State Farm's payment of $25,000 in medical

expenses is not contained in any exhibit, and in any event, the United States asserts that it settled

any and all claims with State Farm.  No subrogation interest remains as far as State Farm is

concerned.

    In sum:

| | |
|---|---|
| **Claimed medical expenses** | **$111,074.11** |
| **Subrogation duty** | **$35,981.08** |
| **Personal payment** | **$1,312.00** |
| **Total award** | **$37,293.08** |

    The Court, therefore, will award Mr. Montgomery $37,293.08 to ensure that he is

compensated for what insurance did not apparently cover, and to fulfil his subrogation duties,

which are his only outstanding obligations related to any medical expenses.

    47.  The Plaintiff produced no evidence of the cost of any future medical treatments, or

even that future medical treatments are probable.  There was also no evidence as to the discount

rate needed to reduce any future medical costs to present value, pursuant to Alabama law.  As a

result, the Court has no basis for finding any future medical costs for Mr. Montgomery and

awards none.

### C.    Lost Wages

48.  Mr. Montgomery testified that he missed the opportunity to teach classes in the fall

of 2003, the summer of 2005, and was limited in the number of classes he could teach in winter

of 2004.  Exhibit 32 only claims lost wages of $10,500, but Mr. Montgomery claims he is owed

$11,729.04.  Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8.  The Court will

credit the lower figure as it is contained in a document that appears to have been produced only

five days before trial.  While no testimony was offered on this document, neither party objected

to its inclusion in the record.

49.  By operation of law, however, Mr. Montgomery's wages must, in the Court's

computation, be reduced by any taxes he would be obligated to pay.  Unlike the Allens, however,

the Montgomerys did not include any tax information or other evidence from which the Court

could compute an appropriate tax rate.  The Court will not speculate on that rate, and

accordingly, finds Mr. Montgomery's lost wages are $10,500.

### D.    Other Economic Damages

50.  Mr. Montgomery claims he is owed out-of-pocket expenses of $9,967.57 relating to

house cleaning costs, various personal property damages, and expenses related to his boat.

Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8-9.  The basis for these

expenses is Exhibit 32.  As there was no objection from the Defendant, the Court finds that Mr.

Montgomery's out-of-pocket expenses total $9,967.57.

E.    **Non-Economic Damages**[3]

51.  The Court finds that Mr. Montgomery is entitled to reasonable compensation for his pain and suffering following the accident. His injuries were painful, and he is impaired from his injuries sustained in the accident. There was, however, little evidence of any future pain and suffering, and Mr. Montgomery's treating physician has indicated that he is pain-free. Testimony of Dr. Weaver; Exhibit 48, Report of Dr. Weaver; Exhibit 31f, Medical Record of Dr. David Covall, dated October 10, 2007. The Defendant suggests a range of somewhere between $75,000 and $100,000.

## PROPOSED CONCLUSIONS OF LAW

I.    **Alabama law on negligence actions and damages.**

1.  Jurisdiction for this Federal Tort Claims Act case is based upon 28 U.S.C. § 1346(b). Under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq., liability is determined in accordance with the substantiative law of the place where the alleged negligent act or omission occurred. 28 U.S.C. § 1346(b)(1); see also Ochran v. United States, 273 F.3d 1315, 1317 (11th Cir. 2001). In Richards v. United States, 369 U.S. 1, 11 (1962), the Supreme Court held that 28 U.S.C. § 1346(b) "requires application of the whole law of the State where the act or omission occurred." Here, the alleged negligent acts committed by the United States occurred in Alabama.

2.  For Plaintiff to recover under a negligence theory in Alabama, they must prove: ""(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and

---

[3] The United States submits these non-economic damages requests in response to the Court's request for itemized damages. These figures are not an admission of any pain and suffering, nor are they an admission of what a reasonable verdict in the plaintiff's favor would be.

(4) damage or injury.'" S.B. v. St. James School, 959 So. 2d 72, 97 (Ala. 2006) (citation omitted). In the context of motor vehicles, a driver is under a duty to use reasonable care in the operation of her vehicle. Jones v. Baltazar, 658 So. 2d 420, 421 (Ala. 1995). Where, as in this case, the defendant's vehicle suffered a tire failure, the trier of fact must decide whether "that mechanical failure, or some negligence of the defendant, was the proximate cause of plaintiffs' injuries." Kinard v. Carter, 518 So. 2d 1248, 1251 (Ala. 1987).

3. If liability is proven, the plaintiff is entitled to an amount of damages at least as high as the uncontradicted special damages, as well as an amount sufficient to compensate the plaintiff for any pain and suffering. Romans v. J.P. Mills, Inc., 844 So. 2d 1239, 1241 (Ala. Civ. App. 2002). The necessity and reasonableness of any medical expenses is a question to be decided by the factfinder, and it is the factfinder's duty to determine whether the medical expenses were proximately caused by the factfinder's negligence. Nix v. Key, 682 So. 2d 1371, 1372-73 (Ala. Civ. App. 1996). "Although the party seeking damages is not required to prove damages to a mathematical certainty, an award of damages may not be based on speculation or conjecture." Bergob v. Scrushy, 855 So. 2d 523, 529 (Ala. Civ. App. 2002). The burden of proof rests with the party claiming damages. Id.

A.    **Alabama's Collateral Source rule**

4. Alabama Code Section 12-21-45 makes evidence that a plaintiff's medical or hospital expenses have been paid or will be reimbursed admissible in civil tort cases. See Ala. Code § 12-21-45. The Eleventh Circuit, in an opinion that was later withdrawn on other grounds, stated that Section 12-21-45 "is Alabama's statutory modification of its common law collateral source rule," and went further to find that the collateral source rule "is as much substantive law

as was the common law rule it modified." Bradford v. Bruno's, Inc., 41 F.3d 625, 626 (11th Cir. 1995) *opinion withdrawn*, 94 F.3d 621 (11th Cir. 1996). Notably, however, the Eleventh Circuit withdrew its opinion because, while the case pending on rehearing, an intervening Alabama Supreme Court decision ruled that Section 12-21-45 was unconstitutional under Alabama law, rendering the foregoing discussion irrelevant and moot since the Section could not apply anywhere. Bradford II, 94 F.3d 621, 622-23 (11th Cir. 1996) *citing* American Legion Post Number 57 v. Leahey, 681 So.2d 1337 (Ala. 1996).

5. At present, however, the Alabama Supreme Court, in a reverse of course, has reinstated Section 12-21-45, holding that the statute is constitutional. Marsh v. Green, 782 So. 2d 223, 232-33 (Ala. 2000). In a footnote, the Court left open the potential for defendants to argue for an offset due to the windfall a plaintiff might reap from double recovery. Id. at 233 n.2. With the reinstatement of the collateral source rule set forth in Section 12-21-45, the logic of the Eleventh Circuit's original Bradford opinion holds sway: because the collateral source rule is a substantive one, it is applicable to federal courts sitting in diversity.

6. While the instant case does not lie in diversity, the FTCA was designed "to provide redress for ordinary torts recognized by state law." F.D.I.C. v. Meyer, 510 U.S. 471, 478 (1994). Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State—the source of *substantive liability* under the FTCA." F.D.I.C., 510 U.S. at 478.

7. As the original Bradford decision made clear, Alabama's collateral source rule is substantive, and the United States may, and did, introduce evidence that the plaintiffs' medical

-21-

bills have been or will be paid by insurance. See also Tirey v. Boyte, 2005 WL 2233068 at *4 (S.D. Ala. 2005) (unpublished) ("While it is true that the Eleventh Circuit has not revisited the issue since withdrawing the Bradford I opinion, and the case has no precedential value, it is persuasive and certainly the best indication of how the Eleventh Circuit would rule on this issue. Therefore, the undersigned finds that the more reasoned view supports the conclusion that the collateral source rule is a substantive rule . . . ."). The United States, therefore, is entitled to an off-set for those medical bills already paid by insurance. The Court notes that the plaintiffs do not argue to the contrary in their proposed findings and have not objected to any evidence at trial introduced regarding insurance payments. In fact, they provided evidence of the off-set amounts through subrogation documents. Exhibit 33, subrogation letter for Mr. Montgomery; Exhibit 63a, subrogation letter for Mr. Allen; Exhibit 64a, subrogation letter for Mrs. Allen; Exhibit 65a, subrogation letter for Ms. Allen. The Eleventh Circuit has noted that it is the general principle of remedies that "an aggrieved party should be put in as good a position as he was in before the wrong, but not better." Alabama Power Co. v. F.C.C., 311 F.3d 1357, 1369 (11th Cir. 2002).

8. In addition, the Court concludes that the plaintiff failed to put competent evidence in the record as to any future costs, medical, wage-related, or otherwise. No evidence was presented as to life expectancies or even the proper discount rate to be applied to reduce future costs to present value. The lack of evidence in this regard prevents the Court from finding any future damages. Cf. Martinez v. Puerto Rico Marine Management, Inc., 755 F. Supp. 1001, 1007-08 (S.D. Ala. 1990) abrogation recognized on other grounds Purdy v. Belcher Refining Co., 781 F.Supp. 1559 (S.D. Ala. 1992) (declining to award damages for lost services, nurture,

guidance, instruction and financial support where no evidence was offered on the value of such services, nor was the life expectancy of the plaintiffs provided during trial).

**B.      Mrs. Moore's speed was not excessive or grounds for a finding of negligence.**

9. The plaintiff has suggested that Mrs. Moore is per se negligent because she was traveling in excess of the statutory speed limit. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 10-17. Under Alabama law, exceeding the statutory speed limit does not, by and of itself, establish actionable negligence. Odom v. Schofield, 480 So. 2d 1217, 1218 (Ala. 1985). The plaintiff also must prove that violation of the speed limit proximately caused his injury. Id.; Fox, 374 So. 2d at 296.

10. The plaintiff has argued that the United States failed to timely object to Trooper Fisher's testimony that Mrs. Moore's vehicle was traveling 83 miles per hour. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 15. The United States filed a motion to exclude that very testimony. Docket No. 55, dated Feb. 12, 2008. The Court permitted Trooper Fisher to testify before ruling on that motion. The United States did not need to offer an objection to that testimony—the Court had ruled that it would hear the testimony. Indeed, the evidence's admissibility was one thing. The weight to be afforded it was another. See Fed.R.Evid. 104(a) (governing questions of admissibility) and Fed.R.Evid. 104(e) (permitting a party to introduce evidence relevant to weight).

11. The Court concludes that the greater weight of the evidence in this case failed to prove that Mrs. Moore was traveling in excess of the speed limit preceding the accident. Trooper Fisher's accident report and testimony have, for reasons previously explained, very little weight. Moreover, the Court does not find persuasive Mr. Flanner's testimony that he had never before

-23-

seen such a damaged tire. Given the nature of this accident, the multiple impacts, and the damage to the vehicles, the Court is not surprised that the tire was badly mangled. It further notes that Mr. Flanner's opinion that the tire struck concrete is not supported by *any* evidence. Any reliance on the photographs in Exhibit 12 is misplaced, since those photographs have been shown as inaccurately representing where the accident occurred. Testimony of Mrs. Montgomery. The plaintiff has, therefore, failed to prove that Mrs. Moore's speed was excessive. In any event, the Court concludes that, even assuming Mrs. Moore violated the statutory speed limit, it was not that violation but the tire deflation event that caused the plaintiff's injuries. Since that deflation would have occurred at any speed, Mrs. Moore's speed at the time of the accident was not the proximate cause of their injuries. Thus, negligence per se has not been demonstrated or proven.

12. Indeed, the Court notes that the plaintiff argues that, if Mrs. Moore were traveling straight in the left-hand northbound lane, at speeds greater than 50 miles per hour, a puncture or deflation will not cause loss of control absent driver input. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 12. According to the plaintiff, that driver input includes "excessive speed." Id. Their own expert, Mr. Prosser, however, testified that at speeds greater than 50 miles per hour, loss of control does not occur absent *some other driver input*, such as stepping on the brake. Testimony of Mr. Prosser. He opined that *stepping on the brake* was the negligent act in this case and not some other cause. The plaintiff cannot have it both ways.

**C.    The Plaintiff has failed to prove that Mrs. Moore acted negligently.**

13. The Court is, thus, left with the plaintiff's remaining theory of liability: that Mrs. Moore was negligent and contributed to her vehicular loss of control by stepping on her brake

-24-

when she became aware of the tire deflation.  Plaintiff's evidence in this regard is Mrs. Moore's

testimony that she stepped on her brake when she became aware of the tire deflation, the

testimony of Mr. Prosser that braking is not the appropriate response to a tire deflation, and some

studies that have found that ordinarily a vehicle driving in a straight line at speeds in excess of 50

miles per hour will continue in a straight line, even after a tire deflation or blow-out.  If Mrs.

Moore's actions were negligent, and her negligence caused the loss of control of her vehicle,

proximately causing this accident, the plaintiff is entitled to recover.

14.  The Defendant has requested that Alabama's "Sudden Emergency" doctrine be

applied to the facts of this case.

15.  Under Alabama law, "a motorist, without fault of [her] own, confronted with a

sudden emergency, is not required to exercise the same presence of mind as would a prudent

person under more deliberate circumstances." Jefferson County v. Sulzby, 468 So.2d 112, 116

(Ala. 1985), quoting Williams v. Worthington, 386 So.2d 408 (Ala. 1980).  While not a defense,

per se, to negligence, the "sudden emergency" doctrine "provides a qualified standard of care by

which . . . a party's conduct can be measured." Burns v. Martin, 589 So.2d 147, 149 (Ala. 1991).

For the doctrine to apply, a party must show that (1) there was a sudden emergency, and (2) the

emergency was not the fault of the party invoking the rule. Friedlander v. Hall, 514 So.2d 914,

915 (Ala. 1987).

16.  The Eleventh Circuit has noted Alabama's sudden emergency doctrine, and found

that it applies to alter the standard of care applicable to alleged negligent driver conduct "in the

face of unexpected circumstances." Salter v. Westra, 904 F.2d 1517, 1521 (11th Cir. 1990).  The

doctrine is related to the "mechanical defect or failure" doctrine, which holds that, in cases of

alleged mechanical failure, it is up to the factfinder to determine whether mechanical failure or driver negligence in response to that mechanical failure, was the proximate cause of a plaintiff's injuries. Id. at 1521-22. In cases where the conduct of the defendant driver in the face of a "sudden emergency" resulting from a "mechanical failure or defect" is alleged to have been negligent, and the negligence alleged relates to a failure to maintain the vehicle or inspect for reasonably foreseeable defects without regard to driver conduct per se, a lack of foreseeability of the defect and the absence of negligence in maintaining the vehicle serve to negate liability. Id. at 1522.

17. Defendant argues that the "sudden emergency" was the tire deflation that occurred when the object that had punctured the tire was ejected, releasing the air in a matter of seconds. The Court concludes that, while the deflation occurred in five seconds or less, Mrs. Moore was not aware of the deflation until she changed lanes, driving 65 miles per hour, and both heard a loud noise and felt the back of her car drop. This is because, as the expert testimony demonstrated, modern vehicle design and tire construction are such that a driver may not be aware that his tire is deflated until some input alters the load on the tire, in this case a lane change. Having the back of your vehicle drop because of a deflated tire at highway speeds is exactly the type of unexpected circumstance contemplated by the sudden emergency doctrine. The Court, therefore, concludes that the doctrine applies, and will hold Mrs. Moore's actions to the standard of care contemplated by the doctrine.

18. The Court concludes that Mrs. Moore's action in stepping on the brake was not an unreasonable action under the sudden emergency doctrine's lower standard of care, and cannot form the basis for proving negligence in this case. The average Alabama driver cannot

-26-

reasonably be expected, in a sudden emergency like this, where a driver traveling at highway

speeds of 65 miles per hour suddenly and unexpectedly hears a loud bang during a lane change

and feels the rear of her vehicle drop out, to not instinctively react to danger by braking. This

bears no resemblance to real life or common sense and, thus, cannot be the law or the basis for a

finding of negligence here.

19. Moreover, even if the sudden emergency doctrine were not applied, the standard of

care is still that of a reasonable person operating her vehicle. The Court concludes that, even

under ordinary principles of negligence, it is not unreasonable to instinctively react to a loud

bang during a lane change, while traveling at 65 miles per hour on a highway, and feeling the rear

of her vehicle drop out, by braking. To hold otherwise would also bear no resemblance to real

life or common sense and, thus, cannot be the law or the basis for a finding of negligence here.

20. The Court concludes that Alabama law does not make negligent the act of braking on

a highway in reaction to a tire failure, such as a deflation or blow-out. While Alabama does not

have any cases directly on point, other jurisdictions have held that a defendant should not be

liable when a tire deflation is the cause of an accident. See, e.g., Huffman v. Mercer, 295 S.W.2d

27, 33 (Mo. 1956) ("If one be precipitated to the left of the road by virtue of circumstances [a

deflation] over which he has no control, one is not negligent.") citing Seligman v. Orth, 236

N.W. 115, 116 (Wis. 1931); Lasseigne v. Kent, 142 So. 867, 868 (La. App. 1932) ("The puncture

of an automobile tire by a large spike, causing the car to upset and fatally injuring a guest therein,

will, under the evidence set out in the case, be considered an accident, which is a casualty which

could not be prevented by ordinary care and diligence.") (citation omitted). While a deflation,

such as the one in this case, is not equivalent to a blow-out, the evidence shows that Mrs.

Moore's awareness of the deflation was sudden and similar to a blow-out. Accordingly, the Court finds cases relating to blow-outs instructive.

21. In a very similar case, the Nebraska Supreme Court upheld a verdict that the puncture of a tire and accompanying deflation was the proximate cause of a car swerving off the road and overturning and, therefore, the driver of the car was not liable for the injuries caused. See Bonacci v. Cerra, 279 N.W. 173, 176-77 (Neb. 1938); see also Kelly v. Gagnon, 236 N.W. 160, 164 (Neb. 1931) (holding that a driver who stepped on brake following a puncture of a tire did not act negligently even though the car "swayed and upset," causing the death of a passenger).

22. Indeed, the North Carolina Supreme Court persuasively recognized that, although stepping on the brake may not be most appropriate response to a tire blow-out, it certainly does not amount to negligence when faced with an emergency and there was no evidence of a defect with the tire. Crowe v. Crowe, 129 S.E.2d 585, 586 (N.C. 1963).

23. A Pennsylvania federal district court has also refused to find a person liable, even with evidence that the person was driving in excess of the speed limit, where a tire was deflated suddenly and the driver lost control of his vehicle, causing an accident. See Ward v. McDan Dav Leasing Corp., 340 F. Supp. 86, 94-95 (D.C. Pa. 1972). The plaintiff himself cites the Court to two Alabama cases, McKinney v. Alabama Power Co., 414 So. 2d 938, 939 (Ala. 1982) and Moore v. Horton, 694 So. 2d 21, 22 (Ala. Civ. App. 1997), in which the sudden emergency doctrine was applied and the factfinder found in favor of the Defendant in spite of evidence of excessive speed. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 13. While the Court concludes that there was no evidence that Mrs. Moore's speed was excessive, nor was her speed a contributing factor to her sudden emergency, it finds these cases instructive as well.

-28-

24. The Court, thus, concludes that the plaintiff has failed to prove that Mrs. Moore acted negligently. This accident was unfortunate as it was unavoidable, but an unavoidable accident does not give rise to liability under Alabama law. <u>Senn v. Alabama Gas Co.</u>, 619 So. 2d 1320, 1324 (Ala. 1993) ("[evidence] of an unfortunate result does not in and of itself raise an inference of negligence. . . . The burden was upon the plaintiff, if he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact. Under all the evidence it was within the province of the jury to find that injury to the plaintiff, if any, was the result of an unavoidable accident, in which case there would be no liability on the part of the defendant.") (citation omitted). As the United States can only be held liable in circumstances where a private person would be held liable, judgment must be entered in favor of the United States. 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674.

**D.    Mrs. Moore was not negligent in the maintenance of her vehicle**

25. The plaintiff has also argued that Mrs. Moore was negligent in the maintenance of her vehicle. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 17-18. First, they argue that Mrs. Moore's left rear tire was 80% worn with respect to Alabama's statutory requirements. <u>Id.</u> This ignores the fact that the tire still complied with the statutory requirements, as testified to by their tire expert, Mr. Flanner. The Court is unpersuaded by the plaintiff's theory.

26. Next, they argue that if the other tires had been in a same or similar condition, that condition could have been contributing factor. <u>Id.</u> at 18. Plaintiff has offered no proof that the other tires in any way contributed to the loss of control. As the plaintiff accurately point out, there were numerous other components and systems that, theoretically, Mrs. Moore could have

-29-

had a duty to inspect. Id. The plaintiff had a burden of proving that she had such a duty with

respect to other components or systems, and they have not. Mrs. Moore testified that she had no

mechanical problems with her vehicle until the day of the accident. She told the plaintiff that she

had a "blow-out" and it caused her to lose control of the vehicle when she contacted him after the

accident. The plaintiff and his attorney never sought to procure Mrs. Moore's vehicle for

inspection. Thus, his speculative theory of negligence due to some other component of the

vehicle is rejected by the Court since it lacks both substance and evidence.

27. Lastly, the plaintiff faults Mrs. Moore for failing to inspect her tire on the day of the

accident and seeing that she had a puncturing object. Id. The location of the puncture was on the

serial side of her tire. The testimony was that, for her to locate it, she would have needed a rack

to lift her car off of the ground and *then* inspected the vehicle's tires. In light of the foregoing,

the plaintiff has failed to prove negligent maintenance of the vehicle or tires.

**E.    Alternatively, the Plaintiff also failed to prove that any negligence
proximately caused his injuries.**

28. As previously noted, for the plaintiff to succeed on a claim of negligence, he must

also prove causation. S.B. v. St. James School, 959 So. 2d at 97. Factual causation, or "but for"

causation, is that part of the causation analysis that asks if the complained-of injury or damage

would have occurred but for the act or omission of the defendant. Springer v. Jefferson County,

595 So. 2d 1381, 1383 (Ala. 1992). "Proximate or legal causation is that part of causation

analysis that asks if "the act for which the [defendant] is responsible [is] of such a nature that

courts of law will recognize it as the [cause] of the injury."" Id. at 1383-84. "In Alabama, the

issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the concept of intervening cause." Id. at 1384.

29. "The requirement of foreseeability is imposed to preclude a finding of liability when the defendant's conduct was part of the causal chain of events leading to the injury but the resulting injury could not have been reasonably anticipated by the defendant." Thetford v. City of Clanton, 605 So. 2d 835, 840 (Ala. 1992). Thus, "[i]t is settled law in Alabama that even if one negligently creates a dangerous condition, he or she is not responsible for injury that results from the intervention of another cause, if at the time of the original negligence, the intervening cause cannot reasonably be foreseen." Adams v. Sanders, 811 So. 2d 542, 545 (Ala. Civ. App. 2001) quoting Sims v. Crates, 789 So.2d 220 (Ala. 2000).

30. Mrs. Moore would not have lost control of her vehicle but for the sudden loss of air in her left rear tire. Testimony of Mr. Cunningham. The location of the puncture was such that Mrs. Moore had no way of knowing it existed. Testimony of Peter Flanner; Testimony of Mr. Cunningham. There were no warning signs, such as under-inflation that could have been noticed. Absent the completely unforeseeable tire deflation, Mrs. Moore would have completed her trip without incident. In addition, any alleged negligence attributed to Mrs. Moore was superseded when her tire deflated. It was not reasonably foreseeable to her, or to anyone else, that her tire would fail catastrophically and cause her to lose control of her vehicle. The causal chain of events leading up to this accident could not have been anticipated. The United States is not responsible for the unforeseen chain of events giving rise to this unfortunate accident. Senn v. Alabama Gas Co., 619 So. 2d 1320, 1324 (Ala. 1993) ("The burden was upon the plaintiff, if he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact. Under

-31-

all the evidence it was within the province of the jury to find that injury to the plaintiff, if any, was the result of an unavoidable accident, in which case there would be no liability on the part of the defendant."); <u>Johnson v. Louisville & N.R. Co.</u>, 198 So 350, 355 (Ala. 1940) ("it is clear that the finding by the jury was that plaintiff's injuries were the result of an unavoidable accident in so far as the defendants were concerned, and this conclusion is supported by the great weight of the evidence. It was not error, therefore, for the court to direct the jury to retire and put the verdict in usual form as a verdict for the defendants."); <u>cf.</u> <u>Carpenter v. City of Belle Fourche</u>, 609 N.W.2d 751, 764 (S.D. 2000) (holding that a jury instruction on unavoidable accidents is appropriate where an "element of 'surprise' is present such as the sudden and unexpected presence of ice, the blow-out of a tire, the malfunction of brakes, or other mechanical failure.").

31. The Court, for the foregoing reasons, concludes that the chain of events that led to this accident could not reasonably have been anticipated by Mrs. Moore or the Defendant. The tire deflation was not a reasonably foreseeable event, nor was it reasonably foreseeable that loss of control would occur.

32. The Court's finding is bolstered by testimony, including that of both experts, that tire deflations themselves, or even tire blow-outs, rarely result in loss of control. The five plaintiffs in this case and Mrs. Moore were all unfortunate victims of a terrible accident. That the law does not provide anyone compensation for their injuries in this case does not render those injuries any less real or the lives any less affected. The circumstances of this case are a reminder that accidents happen, sometimes without fault.

33.  Judgment is hereby entered in favor of the Defendant, United States of America, and against the Plaintiffs.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
Civil Division

PHYLLIS J. PYLES
Director
Torts Branch, Civil Division

GAIL K. JOHNSON
Senior Trial Counsel
Torts Branch, Civil Division


/s/ Conor Kells
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888, Benjamin Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4273
Facsimile:  (202) 616-5200

Attorneys for the Defendant,
United States of America

Dated: March 21, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing upon counsel for

Plaintiffs by electronic filing, CM/ECF:

> Annesley H. DeGaris
> Elizabeth A. Ellis
> Attorneys for the Allen Plaintiffs
> Cory, Watson, Crowder & DeGaris, P.C.
> 2131 Magnolia Avenue, Suite 200
> Birmingham, Alabama 35205
>
> J. Callen Sparrow
> Attorney for the Montgomery Plaintiff
> Heninger Garrison Davis, L.L.C.
> P.O. Box 11310 (35202)
> 2224 1st Avenue North
> Birmingham, Alabama 35203

Dated this 21st day of March, 2008.

> /s/ Conor Kells
> Trial Attorney, Torts Branch
> Civil Division