UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| WALLACE MONTGOMERY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Case No. 2:06-cv-880-WKW |
| ) | [wo] |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wallace Montgomery ("Montgomery")[1] brings this case under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, for injuries he received in an automobile accident on Interstate 65 on August 29, 2003. Bertha Moore ("Moore"), the driver of the vehicle that struck Montgomery's vehicle, allegedly causing the accident, is an employee of the United States Department of Justice. This case was consolidated with *Allen v. United States of America*, No. 2:06-cv-879 for trial,[2] as each case arose out of the same automobile accident. The matter was tried before the court on February 25, 26, and 27, 2008.

### I. JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). The parties do not contest personal jurisdiction or venue, and the court finds allegations sufficient to support both.

---

[1] Phyllis Montgomery, wife of Wallace Montgomery, was originally a plaintiff. The parties settled her claim immediately before trial.

[2] For purposes of entering findings, conclusions and judgment, the cases will be severed.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard the evidence and considered the arguments of counsel, the court makes the following findings of fact and conclusions of law.

**A.     Findings of Fact**

### 1.     The Accident

On August 29, 2003, Wallace Montgomery and his wife, Phyllis Montgomery, (collectively, "the Montgomerys") were traveling south on Interstate 65 on the way to their property on the Mississippi Coast. Michael, Lou Ellen, and Lori Allen (collectively, "the Allens") were also driving south on Interstate 65 on their way to a family reunion in Gulf Shores, Alabama. At the same time, Moore was traveling north on Interstate 65 on her way to Montgomery, Alabama. Moore was returning from a law enforcement seminar in Gulf Shores. The United States stipulates that Moore was, at the time of the accident, working in the line and scope of her employment with the Department of Justice.

In the area where this accident occurred, Interstate 65 consists of two northbound lanes, two southbound lanes, two emergency lanes, and a median separating the north and southbound traffic. The accident occurred around mile marker 106 where the highway is generally straight and flat. (*See* Ex. 12 (photographs of the area of the highway).) The median in this area is grassy, and it angles down in a v-shape between the north and southbound lanes. At the time of the accident, the weather was clear, it was not raining, and the road was dry.[3]

---

[3] Both Moore and Trooper Robert Fisher ("Trooper Fisher") traveled from the south where it was raining. The Montgomerys and the Allens were driving from the north, where the weather was clear. While Moore and Trooper Fisher testified it was raining at the time of the accident and the road was wet, the

2

The accident occurred when Moore lost control of her vehicle, crossed the median, entered the southbound lanes, struck the Allen vehicle first, and then the Montgomery vehicle. Prior to crossing the median, Moore's left rear tire deflated. The Montgomerys, the Allens, and Moore each required medical attention after the accident. A helicopter flew Moore to a hospital in Pensacola, Florida while ambulances transported the Montgomerys and the Allens to a hospital in Evergreen, Alabama.

    a.    **Trooper Fisher's Investigation**

Trooper Fisher was dispatched from Evergreen, Alabama and arrived at the scene approximately 20 minutes after the accident. When Trooper Fisher got out of his car, a woman who was distraught and visibly shaking approached him. She explained that she had been traveling behind Moore as they drove northbound, and the two cars were "running together" at a speed of 83 miles per hour. Trooper Fisher asked the eyewitness to remain at the scene, but by the time he finished investigating the accident she was gone.

Trooper Fisher then began to investigate the accident. He inspected the area of the accident, walked the path traveled by Moore's vehicle, examined the significant damage to all three vehicles, and determined the points of impact. His inspection of the northbound lane revealed no evidence, such as marks, indicative of a "blow-out" or catastrophic tire failure. Trooper Fisher was able to discern the path taken by Moore's vehicle because her

---

Montgomerys and the Allens uniformly and credibly stated the rain started soon after the accident. Trooper Fisher arrived twenty minutes after the accident. The Montgomerys and the Allens presented specific testimony about the weather being clear before the accident and seeing – and feeling – the rain begin to fall as they waited for ambulances to arrive. The court finds that the rain started soon after the collision and that at the time of the collision the weather was clear and the road dry.

3

tires left two rows plowed through the median. Trooper Fisher determined that Moore's vehicle became airborne as it exited the median and entered the southbound lanes. After striking the Allens' vehicle, the Moore vehicle rotated 270 degrees and collided with the Montgomerys' vehicle. Moore's vehicle came to rest on its side in the southbound lane of traffic. The Montgomerys' vehicle spun 180 degrees and ended up in the median facing north. Trooper Fisher's conclusion that Moore's vehicle was airborne is consistent with the testimony of Michael Allen, Wallace Montgomery, and Phyllis Montgomery, all of whom observed Moore's vehicle in the air before impact.[4]

Trooper Fisher completed an accident report (Ex. 7) based on his inspection of the physical evidence and eyewitness statements. In the report, Trooper Fisher listed Moore's speed as 83 miles per hour. The court finds Trooper Fisher's testimony, including Moore's speed, credible.

    b.    **The Tire**

In addition to testimony about the scene of the accident, the parties entered the deflated tire into evidence and presented expert testimony about the tire and its deflation. Based on this testimony the court concludes that Moore's tire did rapidly (but not instantly or explosively) deflate, but that it was her failure to control her car that led to the collisions. The other three tires were unavailable. The deflated tire contained a puncture hole from

---

[4] Michael Allen testified that he saw "something red or burgundy" that "looked like it was coming out of the air." Wallace Montgomery testified that he saw the bottom of Moore's vehicle "up in the air." Phyllis Montgomery testified that Moore's vehicle was "clearly airborne."

which air escaped causing the deflation and had other massive damage.

The experts who examined the tire agreed that it deflated after an object that punctured the tire was ejected from it and created a hole. (*See* Ex. 30G(l) (picture of the puncture hole).) Sometime prior to the accident, a puncturing object (probably a screw or a bolt) became lodged in the left rear tire of Moore's vehicle. The tire was a tubeless steel-belted radial, and this type of tire can carry a puncturing object for several hundred miles before experiencing full deflation. The object was probably in the tire for a length of time before being ejected because imprinted on the rubber of the tread was a hexagonal screw head. During the time the object was in the tire, each revolution of the tire released a small amount of air around the puncturing object. Because Moore did not inspect her tire prior to leaving Gulf Shores, it is unknown if the tire was visibly deflated before she set out for Montgomery.

At the time the object was ejected, it could have taken up to ten seconds for the tire to deflate. None of the expert or lay witnesses testified that Moore suffered a catastrophic blow-out. The court concludes that prior to the accident an object punctured Moore's tire, and the ejection of the object caused the deflation.

The experts agreed that the massive damage to the tire was not the result of deflation but instead the consequence of the tire impacting one or more substantial objects during the accident. An expert credibly testified that the massive damage, including the splitting of the tread circumferentially, was consistent with, and indicative of, an impact at a high rate of

5

speed.

The parties also presented expert testimony on what could have caused the loss of control that resulted in the collisions. The testimony of the parties' experts established that loss of control is an unlikely direct result of a tire deflation. Instead, R.J. Grogan, a researcher and expert whose written research the experts for both parties relied upon, conducted tests revealing that tire deflation alone does not cause a loss of control if experienced while traveling at highway speeds. The government's expert, Ralph Cunningham, testified that after a tire has deflated, the most common cause of loss of control is post-deflation driver input. The court finds this testimony credible, consistent with the evidence, and consonant with common experience.

The court concludes tire deflation did not cause the loss of control here. Instead, the court finds that driver input factors were present and caused the loss of control. Driver input factors that can cause a loss of control include: excessive speed, over-steering, braking too hard, or a combination of these inputs. Furthermore, the condition of the tires on a vehicle that experiences a deflation can contribute to a loss of control.

Moore did not recognize that her tire was deflating until it was fully deflated. When she did recognize the deflation, she hit her brakes, yet stated that she felt the car accelerate before she lost control. Additionally, other evidence establishes Moore was speeding prior to losing control.[5] The court finds that Moore's driver input caused the accident. The court

---

[5] Moore testified that she was not speeding at the time of the accident. She stated that she was traveling at approximately 60 miles per hour before the accident when she changed lanes to pass a vehicle

reaches this finding of fact based upon the physical evidence, expert testimony, testimony of the parties, and testimony of Trooper Fisher.

### 2. **Damages**

At the time of the accident, Montgomery was fifty-eight years old and employed as a part-time college professor. His damages include: medical bills, lost wages, out-of-pocket expenses, past and future pain and suffering, and significant permanent impairment. The parties stipulated and the Montgomerys testified that the following injuries were caused by the accident.

Montgomery suffered severe and permanent injuries to his right knee and leg. He had a depressed tibial plateau fracture and a right diaphyseal tibia fracture. His injuries were treated with an open reduction, internal fixation repair using plates and screws to reconstruct the knee and reduce the tibia. He was ultimately required to have a total knee replacement due to injuries received in the accident. Approximately four years after the accident and two years after the knee replacement, he was required to undergo a third surgical procedure to remove some of the hardware from the initial surgery that continued to cause him pain. He received two physical impairment ratings, fifteen percent by his doctor, Dr. David Covall, and twenty percent by the government's doctor, Dr. Keith Weaver.

Montgomery seeks reimbursement for his medical expenses. Under Alabama law, a

---

moving at a slower speed. Given that the speed limit is 70 miles per hour, the court does not credit Moore's testimony that she was traveling ten miles per hour below the speed limit when she encountered a vehicle moving even slower. Moreover, given the traumatic nature of Moore's injuries and that Moore has no recollection after losing control, the court does not credit Moore's testimony as to speed.

plaintiff may recover reasonable and necessary medical expense incurred as a result of injury.[6] *See Stone v. Echols*, 351 So. 2d 902, 903 (Ala. 1977); Jenelle Mims Marsh & Charles W. Gamble, Alabama Law of Damages § 36:3 (5th ed. 2004). The defendant may present evidence that a collateral source paid for the plaintiff's medical expenses. Ala. Code § 6-5-545.

Montgomery presented evidence that he incurred the following medical expenses as a result of his injuries.

| **Provider** | **Amount** |
| --- | ---: |
| Northside Hospital (Ex. 31(a)(1)) | $6,684.16 |
| Northside Hospital (Ex. 31(a)(2)) | 37,470.00 |
| Piedmont Hospital (Ex. 31(b)) | 25,140.95 |
| Conecuh County Emergency Medical Services (Ex. 31(c)) | 476.00 |
| Evergreen Medical Center (Ex. 31(d)) | 836.00 |
| Peachtree Orthopaedic Clinic (Ex. 31(e)) | 10,455.00 |
| Cumming Resurgens Orthopaedics Cumming (Ex. 31(f)) | 7,545.00 |
| Roswell Surgery Center (Ex. 31(g)) | 3,969.00 |
| Physiotherapy Associates (Ex. 31(h)) | 3,344.00 |
| Northside Hospital Anaesthesia (Ex. 31(I)) | 648.00 |

---

[6] Alabama law governs the standard for damages here. *See Harden v. United States*, 688 F.2d 1025, 1029 (11th Cir. 1982) (stating that "the components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred") (internal quotation marks and citation omitted).

| | |
|---|---:|
| Select Physical Therapy[7] | 10,994.00 |
| Advanced Orthopedic Services | 2,600.00 |
| Range of Motion, Inc. | 1,560.00 |
| TOTAL | **$111,074.11** |

The government contests the amount of Montgomery's medical expenses, contending that there is not sufficient evidence about the amount of the bills. However, the court was able to deduce the amount of Montgomery's medical expenses by referring to bills from medical providers entered into evidence and the list of stipulated charges. The government also argues that the damages are limited to $37,293.08, which represents the amount of Blue Cross Blue Shield of Georgia's subrogation interest and the amount charged by Evergreen Medical Center and Conecuh County Emergency Medical Services, because Montgomery has not presented evidence that he is actually responsible for the other medical expenses. However, the government ignores evidence contained within the billing records that Montgomery paid for at least some of the other expenses himself.

The parties also stipulated to $11,720.04 in lost wages. Because of injuries from the accident, Montgomery did not carry a full teaching load for three semesters. The government argues that Montgomery's lost wages must reduced by the amount of taxes he would have paid on that amount. However, the government provided no information about what

---

[7] There are not separate exhibits setting forth the bills for Select Physical Therapy, Advanced Orthopedic Services, and Range of Motion, Inc. However, payments to these providers are included on the list of payments for which Blue Cross has a subrogation interest, and the government has stipulated to the amounts contained in the subrogation list. Accordingly, the court finds that these amounts are owed to Montgomery.

Montgomery's tax rate would have been.  But even if the government presented evidence about Montgomery's tax rate, the court would not offset the lost wages amount.[8]  Additionally, Montgomery had $9,967.57 in out-of pocket expenses.[9]

Montgomery's physical impairment, which the doctor hired by the government to examine Montgomery rated at twenty percent, and his substantial pain and suffering, foretell substantial damages.  The government has suggested a range of $75,000 to $100,000 to compensate Montgomery for his pain and suffering.  His injuries were severe and life-changing, requiring days in the hospital on more than one occasion.  His wife testified that she gave him shots in the abdomen twice a day for ten days to prevent blood clots.  For months, his sleeping arrangements were altered, and he often had to use a recliner as a bed.  His leg was swollen "like a log," and after one surgery he was on a leg extender machine for

---

[8] There is at least one Eleventh Circuit case requiring the award of lost wages to be offset by tax liability in a Federal Tort Claims Act case. *See Harden*, 688 F.2d at 1029-30.  In *Harden*, the Eleventh Circuit held that the FTCA *required* that taxes be deducted from an award for lost wages "to avoid an award of punitive damages." *Id*.  The FTCA specifically bars the award of punitive damages.  28 U.S.C. § 2674.  The Supreme Court subsequently rejected the argument that damages that are not strictly compensatory in nature are prohibited under 28 U.S.C. § 2674 as an award of punitive damages. *Molzof v. United States*, 502 U.S. 301, 312 (1992).  The Supreme Court clarified that "§ 2674 bars the recovery only of what are legally considered 'punitive damages' under traditional common-law principles." *Id*.  One district court in the Eleventh Circuit has found that *Harden*'s analysis, which focuses on whether the effect of the award of damages was punitive, is no longer good law after *Molzof*. *See Childs v. United States*, 923 F. Supp. 1570, 1583-84 (S.D. Ga. 1996).  Given the narrow definition of "punitive damages" put forth by the Supreme Court in *Molzof*, this court simply cannot conclude that § 2674 requires the court to offset the lost wages by the plaintiff's tax liability.

[9] *See* Ex. 32(b).  The out-of-pocket expenses include:  house cleaning, maid services, personal property items that were broken or lost in the wreck, items needed for Montgomery's recovery, and boat expenses.  The boat expenses are included because the Montgomerys were traveling to Mississippi to move their boat to another location.  Because of the accident, the Montgomerys were unable to move the boat and were required to pay for power, water, and maintenance at two locations until the boat could be moved.  The government stipulated to these expenses, including those related to the boat.

six to eight hours per day, therapy he described as "torture." He endured months of rehabilitation. Even after knee replacement, he cannot walk fast, he limps, and he suffers from swelling, stiffness, and pain. His injuries and disability substantially affect life activities, such as golfing, boating, yard work, and heavy lifting.

In view of all the evidence, the court finds that Montgomery's total damages are $485,000.00, which includes compensation for pain and suffering, permanent impairment, reasonable and necessary medical expenses, lost wages, and out-of-pocket expenses.

### B.   *Conclusions of Law*

This a negligence case. Wallace Montgomery claims injuries as the result of the negligence of the government's employee, Moore. Under Alabama law, a plaintiff bears the burden of proving the four elements of a negligence claim: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *S.B. v. Saint James Sch.*, 959 So. 2d 72, 97 (Ala. 2006); *see also* Alabama Pattern Jury Instructions Civil § 28.1 (2d ed. 1993). In this case, the duty at issue is Moore's duty to exercise reasonable care in the operation of her vehicle so as to avoid injuring others using the same public highway. Reasonable care means such care as a reasonably prudent person would exercise under the same or similar circumstances. *See Jones v. Baltazar,* 658 So. 2d 420, 421-22 (Ala. 1995); *see also* Alabama Pattern Jury Instructions Civil § 26.00. The government claims Moore did not breach the standard of care and that her conduct was not the proximate cause of Wallace Montgomery's injuries.

### 1. Moore was Negligent in the Operation of Her Vehicle and is not Entitled to Application of the Sudden Emergency Doctrine

The government has raised the issue of the sudden emergency doctrine, asking the court, in essence, to lower the standard of care to which Moore should be held accountable under the circumstances of this accident. For the sudden emergency doctrine to apply, "there must be (1) a sudden emergency; and (2) the sudden emergency must not be the fault of the one seeking to invoke the rule." *Friedlander v. Hall*, 514 So. 2d 914, 915 (Ala. 1987). Application of the sudden emergency doctrine is a question for the fact finder. *Id*.

Under Alabama law, the sudden emergency doctrine alters the standard of care when a person confronts a sudden emergency. *See Polansky v. Dixon*, 587 So. 2d 401, 403 (Ala. Civ. App. 1991) (stating that under the sudden emergency doctrine an individual "is not held to the same correctness of judgment and action as if he had time and opportunity to fully consider the situation"). As this court noted in an earlier order (Doc. # 57), the Alabama Supreme Court has questioned whether the sudden emergency doctrine has any real application because the ordinary negligence standard requires a person to act as a reasonably prudent person would under all the circumstances, including those of a sudden emergency. *See Merrit v. Simonson*, 630 So. 2d 428, 430 (Ala. 1993). The sudden emergency doctrine does not apply in this case because: (1) a tire deflation of this nature is not a sudden emergency; and (2) Moore contributed to the situation.

The situation in which Moore found herself does not constitute a sudden emergency. Both Peter Flanner, the plaintiffs' expert, and Ralph Cunningham, the government's expert,

testified that Moore did not experience a "blow out" or a catastrophic tire failure. Instead, it is undisputed that the deflation was the result of a puncturing object – probably a screw or bolt. This object was in the tread of the tire toward the serial side (inside) and probably had been carried for a fairly long period of time.[10] The deflation occurred when this object was finally ejected from the tire and air escaped through the puncturing hole. The government's expert testified that the time for deflation from the instant of ejection of the object could have been up to 10 seconds. This full loss of air pressure would have followed some measure of deflation that would have occurred as the tire carried the puncturing object for as much as several hundred miles. While the ejection of the object resulted in a total loss of air pressure, it was not explosive nor was it sudden.

Moreover, the evidence shows the deflation of the tire did not cause Moore to lose control of her vehicle. Experts for both sides agreed that a tire deflation while a vehicle is traveling at highway speeds (above 50 miles per hour) will not cause a loss of control absent driver input. This is especially true on a dry road surface as in this case. Although Moore testified that she was changing lanes when she lost control, her testimony about her actions prior to changing lanes contains various inconsistent scenarios.[11] The great weight of the evidence is that Moore was traveling straight in the left northbound lane when she

---

[10] The object had been in the tire long enough to leave a hexagonal imprint on the rubber of the tread.

[11] Moore testified at trial that she lost control as she was changing lanes to pass another vehicle. However, her testimony was inconsistent about when she lost control. Moreover, in an earlier deposition, Moore stated that she lost control of the vehicle after changing lanes. The court does not credit Moore's testimony because of its inconsistencies and for the reasons previously stated.

experienced the tire deflation. Accordingly, deflation of the tire alone should not have resulted in loss of control. A preponderance of the evidence indicates that following the tire deflation some action by Moore caused loss of control.[12] In determining whether an individual contributed to the emergency, Alabama courts have recognized that speed is a factor the fact finder may consider. *See McKinney v. Ala. Power Co.*, 414 So. 2d 938, 939 (Ala. 1982); *Moore v. Horton*, 694 So. 2d 21, 22 (Ala. Civ. App. 1997).

Evidence indicates that Moore was traveling at an excessive speed prior to the accident. The physical evidence especially supports this conclusion. Moore's vehicle was traveling fast enough to cross the median, which was angled downward from both the north and southbound lanes, and emerge with sufficient momentum to become airborne as her vehicle entered the southbound lanes. After striking the Allens' vehicle, Moore either became or remained at least partially airborne prior to striking the Montgomerys' vehicle. All three vehicles were severely damaged and were totaled as a result of the catastrophic collisions.

Expert testimony regarding damage to the tire also indicated that Moore's speed was excessive. The tire deflated as air escaped through a puncture hole, but the tire itself reveals significant physical damage. The experts who testified agreed that the damage was the result of the tire's impact with one or more substantial objects. Plaintiff's expert, Peter Flanner,

---

[12] Even assuming that the tire deflation was a sudden emergency, a preponderance of the evidence shows that Moore contributed to the emergency. "One who has by his own conduct brought about the sudden peril may not invoke the benefits of the doctrine." *Williams v. Worthington*, 386 So. 2d 408, 409 (Ala. 1980).

testified that in his almost fifty years in the tire industry he has never seen a tire damaged as severely from external forces as the one involved in this case. He explained that the circumferential damage to the steel-belt area of the tread is remarkably difficult to achieve because of the strength of that component of the tire.

Trooper Fisher also testified at trial that Moore was traveling at an excessive speed. He based this conclusion on his investigation. The first evidence of Moore's speed was the eyewitness statement that Moore's vehicle was traveling 83 miles per hour before the accident. The eyewitness was visibly shaking when she voluntarily approached Trooper Fisher as he arrived at the scene. She explained that she knew the speed because she was also driving 83 miles per hour and that she and Moore were "running together."[13]

Trooper Fisher's review of the physical evidence also revealed that Moore was speeding. Trooper Fisher inspected the vehicles and retraced the path of Moore's vehicle. His review revealed no yaw marks, squeegee marks, or scuffs or scallops. However, where

---

[13] The government filed a motion in limine (Doc. # 55) and objected to the testimony about the speed. The court admitted the evidence because it fell within the following hearsay exceptions: (1) excited utterance; (2) present sense impression; and (3) statement against interest. The statement qualifies as an excited utterance because it was voluntary, spontaneous, and made near in time to the event. *See* Fed. R. Evid. 803(2). The statement also is a present sense impression because the eyewitness observed the event, her statement described the event, and her statement was substantially contemporaneous with the event. *See* Fed. R. Evid. 803(1); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 704-06 (S.D. Ga. 1993). Finally, the statement is a statement against interest. The declarant is unavailable and made a statement that could have exposed her to criminal liability because she admitted to speeding. A reasonable person would not have approached a state trooper and admitted to speeding unless the statement were true. *See* Fed. R. Evid. 804(b)(3). It is also noted that the government did not object to the testimony of Trooper Fisher when it was presented. In its briefing, the government rests on its motion to preserve the objection. The court expected a timely objection despite the motion, which would have been proper after the plaintiff laid the foundation for the testimony. Whether the objection was preserved or not, the government made no motion to exclude the testimony.

Moore's vehicle went through the median, the grass was plowed up. Based on this physical evidence, Trooper Fisher testified, without objection, that Moore's vehicle was traveling over 70 miles per hour[14] and her excessive speed caused the vehicle to become airborne. Because the court finds significant indicia of trustworthiness in the statement by the unknown witness, the court concludes that Trooper Fisher's testimony regarding the speed of Moore's vehicle is trustworthy. Moreover, upon careful consideration of the totality of the circumstances, the credibility of the witnesses, and the physical results of the accident, the court would find that Moore was speeding irrespective of the statement of the unknown witness.

The court concludes that Moore breached the standard of care and the sudden emergency doctrine does not apply.

### 2.     The Tire Deflation Was Not an Intervening, Superseding Cause

The government also argues that because the tire deflation is an intervening, superceding cause, Moore did not proximately cause Montgomery's injuries. The facts do not support this defense. Under Alabama law, "an act is superceding only if it is unforeseeable. A foreseeable intervening act does not break the causal relationship between the defendant's action and the plaintiff's injuries." *Kelly v. M. Trigg, Enters., Inc.*, 605 So. 2d 1185, 1190 (Ala. 1992). An intervening cause only breaks the chain of causation between the act and injury if it was not reasonably foreseeable. *Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1195 (Ala. 1985).

---

[14] Trooper Fisher testified Moore was traveling over 70 miles per hour "for definite," based upon his examination of the evidence at the scene.

The tire deflation here is not a superseding, intervening cause. First, because tire deflation is a foreseeable event, it cannot be an intervening, superceding cause. There was expert testimony at trial that there are standards about how drivers are to respond to tire deflation. The existence of these standards establishes that tire deflation is a foreseeable event. Moreover, common sense dictates that when driving a car it is not unforeseeable that tire deflation may occur. Also, as explained above, Moore's additional driver input – not the tire deflation – caused the loss of control and collision in this case.

The court concludes by a preponderance of the evidence that Moore acted negligently, proximately caused injuries to Montgomery, and that the government is liable in damages to Montgomery in the amounts set forth above.

### III. CONCLUSION

Based on the foregoing, the court finds in favor of Plaintiff Wallace Montgomery and against Defendant United States. A judgment consistent with this opinion will be entered.

Done this 23rd day of June, 2008.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE